## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOANNA TOTH, individually, and on behalf of
all others similarly situated,

              Plaintiff,

     v.

SCOTT CREDIT UNION, and DOES 1-100,

            Defendant.

**Civil No.: 3:20-cv-306**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff JoAnna Toth ("Plaintiff"), by her attorneys, hereby brings this class action against Scott Credit Union and DOES 1 through 100 (collectively "SCU" or "Defendant").

## NATURE OF THE ACTION

1.     All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.     This is a class action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated.  SCU wrongfully charged Plaintiff and the Class Members overdraft fees and Non-Sufficient Funds ("NSF") fees.

3.     This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, SCU's policy and practice of assessing an overdraft or NSF Fee on transactions when

1

there was enough money in the checking account to cover (pay for) the transactions presented for payment and for charging repeat NSF fees on the *same* electronic item. The charging of such overdraft and NSF fees breaches SCU's contracts with its members, who include Plaintiff and the members of the Class.

4.    The charging for such overdraft fees also violates federal law. Based on information and belief, SCU failed to describe its actual overdraft service in its Opt-In Agreement by, *inter alia*, failing to describe accurately in its Opt-In Agreement the actual method by which SCU calculates its overdraft fees, and because SCU also violated or did not fulfill other prerequisites of Regulation E, 12 C.F.R. §§ 1005.17 *et seq*., of the Electronic Fund Transfer Act, 15 U.S.C.A. §§ 1693 *et seq*., before charging overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions, 12 C.F.R. § 1005.17(b)(1).

## **PARTIES**

5.    Plaintiff JoAnna Toth is a resident of Mt. Vernon, Illinois and was a member of SCU at all times relevant to the class action allegations.

6.    Based on information and belief, Defendant SCU is and has been a federally-chartered credit union with branches in Illinois and Missouri, and with its headquarters located in Edwardsville, Illinois. SCU is a "financial institution" within the meaning of Regulation E, 12 C.F.R. § 1005.2(i).

7.    Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of SCU and, upon information and belief, also own and/or operate SCU branch locations. Each of defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E, 12 C.F.R. § 1005.2(i). As used herein, where appropriate, the term "SCU" is also inclusive of defendants DOES 1 through 100.

8.      Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

9.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.      At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.      Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.      As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C.

§ 1331 and 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are

100 or more Class members, (ii) there is an aggregate amount in controversy exceeding

$5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least

one plaintiff and one defendant are citizens of different States.  This court has supplemental

jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant

is headquartered and resides in this District and a substantial part of the events and/or omissions

giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

15.     SCU is a credit union with approximately 17 branches in Illinois and Missouri

with over 144,000 members and holding more than $1.2 billion in assets.  SCU offers its

consumer banking customers a checking account.  One of the features of an SCU checking

account is a debit card, which can be used for a variety of transactions including the purchasing

of goods and services.  In addition to receiving a debit card, other features of an SCU checking

account include: the ability to write checks; withdraw money from ATMs; schedule Automated

Clearing House (ACH) transactions (which include certain recurring payments); and other types

of transactions that debit from a checking account.

16.     In connection with its processing of debit transactions (debit card, ATM, check,

ACH, and other similar transactions), SCU assesses overdraft and NSF fees to member accounts

when it claims to have determined that a member's account has been overdrawn.

17.     Overdraft and NSF fees constitute the primary fee generators for banks and credit

unions.  In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as SCU, overdraft and NSF fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions.  Filene Research Institute Report, *Overdraft Regulation: A Silver Lining In The Clouds?* (Filene Research Institute 2010).

18.     The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.  Pew Charitable Trust Report, *Overdraft America:  Confusion and Concerns about Bank Practices*, at p. 4 (May 2012).  More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program, *id*. at p. 5, while more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee, *id*. at p. 10.

19.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who are more likely to be assessed overdraft fees.  *Id*. at p. 1.  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  *Id*. at p. 3.  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  *Id*. at p. 4.  And non-whites are 83%

more likely to pay an overdraft fee than whites.  *Id*. at p. 3.

20.     As a result of banks and credit unions having taken further advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

21.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. 12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").

22.     To qualify as affirmative consent, the Opt-In Agreement must accurately describe the overdraft program and must include, but is not limited to, the following:

- the customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day (if there is not a maximum, that fact must be stated);

- the financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available;

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_Rulemaking.pdf, at p. 74-75 [last viewed March 24, 2020].

- the consent must be obtained separately from other consents and acknowledgements;

- the consent cannot serve any purpose other than opting into the overdraft program;

- the consent cannot be a pre-selected checked box; and

- the financial institution may not provide different terms for the account depending on whether the customer opted into the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-In Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

23.    At all relevant times, on information and belief, SCU has had an overdraft and NSF fee program in place for assessing overdraft and NSF fees which, *inter alia*, is (1) contrary to the express and implied terms of its contracts with members; (2) contrary to SCU's representations about its overdraft and NSF fee program to its members; and (3) contrary to its members' expectations regarding the assessment of such fees.

24.    There are three balances in an account: the "balance;" the "collected available balance;" and, the "artificial available balance."  The "balance" (sometimes called the "actual balance" or "ledger balance") is the money in the account, without deductions for holds on pending transactions or on deposits.  It is the official balance of the account.  It is the balance provided to the customer in monthly statements, which are the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.  Further, based on information and belief, it is the balance used by SCU to report its deposits to regulators, shareholders, and the public.  It is the balance provided to regulators in

call reports and reserve reports.  It is the balance used in financial reports to shareholders and the balance used for internal financial reporting.  It is also the balance used by credit reporting agencies in providing the credit ratings of SCU.

25.     The "collected available balance" is the "balance" less holds placed on certain deposits pursuant to a financial institution's "Funds Availability Policy" ("FAP").  Regulation CC, 12 C.F.R. part 229, establishes maximum permissible hold periods for checks and other deposits and all financial institutions are required by it to have an FAP.

26.     The "artificial available balance," as used by SCU, is a completely different calculation than the "balance" and "collected available balance."  Although the "artificial available balance" has the words "available balance" in it like the "collected available balance" has, the "artificial available balance" is an accounting gimmick which takes the "collected available balance" and then further deducts from it pending debit card transactions which have not yet posted (and which might not ever post), meaning the money is still in the account of the credit union member.  In other words, the "artificial available balance," unlike the "collected available balance," deducts not only holds that SCU has placed on deposits, but also additionally deducts holds which SCU has placed on pending debit card transactions.  Notably, there is no requirement to use the "artificial available balance."

27.     While SCU's contracts indicated to members that it was using the "balance" to determine and assess overdraft and NSF fees, in fact, it was using the "artificial available balance."  For many years, SCU had no authority, disclosure, or statement in its contracts stating that it was using the "artificial available balance" for purposes of assessing overdraft and NSF fees, yet this was SCU's practice.  In other words, SCU's policy and practice was to ignore the actual amount of money in its members' accounts for purposes of assessing overdraft and NSF

fees as provided for in its contracts, and instead based such assessments on the money in the account only after deducting pending debit card transactions and holds placed on deposits.  SCU did this in order to increase the number of overdraft and NSF fees charged, and to maximize its profits.

28.    SCU entered into a written contract with Plaintiff and the other Class Members titled "Account Agreement."  (Exhibit A, Account Agreement dated October 2013.)  The Account Agreement contained a promise that SCU would not charge overdraft or NSF fees for any type of transaction when there was enough money in the account to pay for the transaction. It stated in the section called "Courtesy Pay" that "Courtesy Pay is a service that allows us to pay . . . items presented against our member's checking account even if it causes the account to become overdrawn."  It further stated "[m]aking regular deposits sufficient to cover transactions" and "[b]ringing the account to a positive balance at least once every thirty days" are factors that determine whether an account qualifies for overdraft coverage.  What it did not state in any way, however, was that holds on deposits or pending debit card transactions could affect a determination as to whether an account was overdrawn.  Instead the language used suggested that an account would not be overdrawn when customers "make regular deposits sufficient to cover transactions" and maintain a "positive *balance*"—which refers to the actual balance in the account.  Nowhere did the Account Agreement state that to determine whether there was money in an account to cover a transaction, SCU would not look to the actual amount of money in the account but, instead, to the money in the account only ***after deducting holds placed on deposits and after also deducting holds placed on pending debit card transactions***.  Further, the Account Agreement made no mention of the term "available balance," and instead only referred to "balance" or "current balance" which mean all of the money in an account, and not a subset of

the money in an account subject to holds. Per the language in the Account Agreement, a fee could only be imposed when the account as a whole contained less money than was called for. Yet, despite the Account Agreement's express language, SCU actually determined when to charge overdraft or NSF fees not based on the money in the account but based on the money in the account after deductions for holds on deposits and pending debit transactions.

29.    The Account Agreement, at most, stated in a separate section pertaining to deposits rather than to overdraft/NSF fees that temporary holds might be placed on certain deposited items before they could be withdrawn (the "collected available balance"), but this section does not state that such holds will be considered in determining when overdraft/NSF fees occur and, indeed, nowhere was it stated in the Account Agreement that overdraft/NSF fees could result from holds placed on funds earmarked for pending debit card transactions (the "artificial available balance").

30.    SCU changed its Account Agreement in or around March 2017 to purport to change its contract terms as to when and how it would charge an overdraft or NSF fee. (Exhibit B, Scott Credit Union March 2017 Account Agreement.) Specifically, the new agreement as of March 2017 stated that SCU would place holds on pending debit card transactions and thereby reduce the balance available for purposes of assessing when an overdraft or NSF fee would occur, and it specifically defined "available balance" in this manner to account for holds on pending debit card transactions and holds on deposits. Not only did such terms not exist in the prior versions of the Account Agreement, but, as stated, there was not even any remote implication that a hold might be placed on pending debit card transactions to reduce the balance in the account to an artificially lower one for purposes of assessing an overdraft or NSF fee. SCU's changes and additions to the terms of its March 2017 Account Agreement underscore and

reinforce that prior to March 2017, the Account Agreement did not in any way specify that a hold on pending debit transactions, or holds on deposits, would be used to determine whether an overdraft or NSF fee could be assessed. Discovery will be needed to determine whether and/or how SCU notified existing members of these purported changes.

31.     SCU was also required by Regulation E to obtain the affirmative consent of its members before being allowed to charge them an overdraft fee on a non-recurring debit card transaction or ATM withdrawal. The importance of Regulation E is highlighted by the fact that the Consumer Financial Protection Bureau's ("CFPB") study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

32.     Pursuant to Regulation E, SCU was required to enter into a second written contract with Plaintiff and other members before it could assess overdraft fees on ATM and one-time debit transactions. On information and belief, the contract is titled, "What You Need To Know About Overdrafts And Overdraft Fees" and is referred to herein as the "Opt-In Agreement." On further information and belief, the Opt-In Agreement defines an "overdraft" as follows: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." This promise means that SCU was not authorized to assess an overdraft fee—because an overdraft had not occurred—unless there was not enough money in the member's account to cover the transaction, and SCU used its own money to pay the

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf [last viewed March 24, 2020].

transaction. It does not in any way state that there will be deductions made from the money in the member's account arising from holds placed on pending debit card transactions to create a different "artificial available balance," nor does it state that holds placed on deposits would lower the amount of money in the account and create a "collected available balance" for purposes of allowing an overdraft fee to be assessed. Furthermore, because, *inter alia*, the Opt-In Agreement does not describe SCU's actual overdraft practice, let alone in a manner which is "clear and readily understandable" as required by 12 C.F.R. §205.4(a)(1), the Opt-In Agreement fails to comply with Regulation E's opt-in requirements. Alternatively, on information and belief, SCU did not follow additional Regulation E opt-in requirements and, thus, failed to obtain customers' opt-ins (*i.e.* affirmative consent) before charging them overdraft fees for ATM and non-recurring debit transactions, in violation of Regulation E. Discovery will be necessary to determine if any further Regulation E violations have occurred in the opt-in process.

33.    SCU clearly could have accurately described its overdraft program in its Opt-In Agreement. Because it did not, SCU breached that agreement when it charged overdraft fees on a positive balance, and it violated Regulation E, *inter alia*, by charging any overdraft fees whatsoever on ATM and debit card transactions, given that it did not accurately describe its overdraft program in the required notice, or otherwise follow Regulation E's requirements.

34.    SCU also has an improper practice of charging multiple NSF fees for the same electronic item. SCU charges a $27 fee when an electronic transaction or item is first processed for payment and SCU determines that there is not enough money in the account to cover the transaction (a practice that wrongfully used the "artificial available balance" described above). SCU then charges an *additional* NSF fee if the same item is presented for processing again by the payee, even though the account holder took no action to resubmit the item for payment. This

violates the Account Agreement, *inter alia*, in the Courtesy Pay section, which states that when an account is "overdrawn," SCU may "pay or return an item, [and] your account will be assessed a Non-Sufficient Funds charge" and the "current charge per item is $27." In other words, the Account Agreement drafted by SCU states, in the singular, "**a NSF charge**" will be assessed, not plural "**multiple NSF charges**" will be assessed. "Item" means a single electronic transaction, and a "representment" or "retry" of an "item" does not change it into a new or different item. It is still the same "item" being presented by the same merchant in the same dollar amount; not a new "item." An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the member, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes. Furthermore, although Plaintiff is unaware at this time whether SCU's Fee Schedule was ever served on Class Members in a manner required to make it effective, and this will require discovery, the Fee Schedule also states that an NSF fee will only be charged as "$27 per item," and not "$27 per presentment of item." (Exhibit C, February 2014 Scott Credit Union Fee Schedule.) Notably this language did not change until SCU revised its Account Agreement language in or about April 2019. The April 2019 Account Agreement now states that SCU "may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item or resubmission(s) of the returned item." (Exhibit D, Scott Credit Union April 2019 Account Agreement.) The Fee Schedule language has not changed, however, and still reads that a $27 NSF fee is charged "per item."

| Scott Credit Union Member Fee Schedule |  |
|---|---|
| Last updated March 1st, 2020 | |
| **Share, Share Draft and Money Market Accounts** | |
| Insufficient Funds (NSF) per item | **$27.00** |

(Exhibit E, Scott Credit Union March 2020 Fee Schedule.)  Discovery will be needed to determine whether and/or how SCU notified existing members of this purported change.

35.     Prior to at least April 1, 2019, SCU's Account Agreement provided no disclosure of this practice and deceived SCU's accountholders.  SCU's practice of charging multiple NSF fees for a single electronic item was particularly egregious because, as described, SCU assessed such fees using the improper calculation of the balance in a member's account (the "artificial available balance"), causing additional fees, confusion, and ambiguity.  Specifically, because SCU charged NSF fees improperly, and because SCU's improper deduction of the $27 fee deduction from a member's account further decreased the member's "balance," it generated even more NSF fees or overdraft fees to the account.

36.     Courts in various jurisdictions have recognized that when banks and credit unions charge multiple NSF fees on the same item while failing to clearly disclose such practice gives rise to claims and causes of action on a class wide basis.  *See e.g.*, *Morris v. Bank of America*, No. 3:18-cv-00157-RJC-DSC, 2019 WL 1274928 (W.D.N.C., March 29, 2019) (Order denying motion to dismiss allegations regarding improper repeat NSF claims); *Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM, Docket No. 23 (E.D. Ark., Oct. 21, 2019) (Order denying motion to dismiss repeat NSF claims); *Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co., Missouri, Circuit Court, Oct. 18, 2019) (Order denying motion to dismiss repeat NSF claims); *Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Davidson Co. Tenn., Chancery Court, Oct. 17, 2019) (Order denying motion to dismiss repeat NSF claims); *Noe v. City National Bank of West Virginia,* Civil Action No. 3:19-0690 (S.D.W.V. Feb. 19, 2020) (Order denying motion to dismiss repeat NSF claims); *Ingram v. Teachers Credit Union*, Cause No. 49D01-1908-PL-035431 (Indiana Commercial Court, Marion County Superior Court) (Order denying motion to

dismiss repeat NSF claims); and *Perks, et al. v. TD Bank, N.A.,* Civil Action No. 18-CV-11176 (S.D.N.Y. Mar. 17, 2020) (Order denying motion to dismiss breach of contract claim for repeat NSF fees).

37.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of all contracts at issue.

38.    Meanwhile, Plaintiff and the Class Members could not have anticipated the harm resulting from SCU's practice throughout the class periods.  The money in the account, without deductions for holds on pending transactions or on deposits, as already stated, is known as the "balance," and is considered the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used by SCU to determine interest on deposits to regulators, shareholders and the public, the balance provided to regulators in call reports and reserve reports, and the balance used in financial reports to shareholders and the balance used for internal financial reporting.  It is reasonable therefore to understand that all of the money in a member's account was available for use to pay debit card or other transactions before an overdraft or NSF fee would be assessed.

39.    The CFPB has concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance which has deducted pending transactions, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive."  The CFPB further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)."  CFPB, *Supervisory Highlights*, at p. 9

(Winter 2015).[3]

40.     Yet contrary to the promises in the Account and Opt-In Agreements, SCU's policy and practice was to ignore whether there was money in the account or a negative balance, and assess overdraft or NSF fees based on the artificial internal calculation by which it deducted holds placed on pending debit card transactions and deposits, the "artificial available balance," rather than use the actual money in the account as required by the contracts without deduction for pending debit card transactions, or holds placed on deposits, to determine whether an overdraft or NSF has occurred for purposes of assessing an overdraft or NSF Fee.

41.     Under the Account Agreement and Opt-In Agreement, although Plaintiff disputes it, the only funds which even *arguably* might due to ambiguity be considered as "available" for purposes of overdrafts or NSFs, were those which were subject to temporary holds immediately upon deposit pursuant to the credit union's FAP, meaning the "collected available balance," (even though this is not stated or disclosed in the section pertaining to overdrafts) but not funds on which holds were placed due to pending debit transactions (the "artificial available balance"). Although Plaintiff's position is that, under its contractual terms with the Class Members, SCU could only charge an overdraft or NSF fee if the balance in the account became negative without regard to any deductions for holds on deposits, or any other holds, the absolute best case scenario for SCU is that there might be an arguable ambiguity in the contract which might have allowed SCU in certain circumstances to place holds on recently deposited funds in the account and deduct those from the account balance in determining whether or not an overdraft or NSF occurred (meaning use of the "collected available balance").  But in no case prior to at least

---

[3] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf [last viewed March 24, 2020].

March 2017 was SCU even arguably permitted to deduct from the account funds on which holds had been placed for transactions which had not yet gone through (meaning use of the "artificial available balance").

42.     Like SCU's post-March 2017 Account Agreement, numerous financial institutions' account contracts explain how those institutions place holds on pending debit card transactions and how those holds reduce the amount of funds which are consulted to determine when overdrafts occur.  For example, the account contract of Affinity Federal Credit Union states, in bold, that "[a] temporary debit authorization hold affects your account balance."  The language beneath this header explains that "the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold."  (Exhibit F, Affinity FCU Account Agreement.)  Likewise, GTE Federal Credit Union's account contract contains the following language since June 2016:

> YOUR CHECKING ACCOUNT BALANCE: . . . Any purchases, holds, fees, charges, or deposits made on your account that have not yet posted will not appear in your actual balance . . . Your available balance is the amount of money in your account that is available to you to use without incurring an overdraft or NSF fee. The available balance takes into account things likes holds placed on deposits and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but have not yet posted to your account . . . .

(Exhibit G, GTE FCU Account Disclosure.)  Logix Credit Union has also adopted an account contract which specifically states debit holds can cause overdrafts:

> The available balance takes into account things like holds placed on deposits and payments that have been authorized but have not yet posted to your account (such as pending debit card purchases). For example, assume you have an actual balance of $50 and an available balance of $50. If you were to swipe your debit card at a restaurant to buy lunch for $20, then that merchant could ask us to pre-authorize the payment. In that case, we will reduce your available balance by $20. Your actual balance would still be $50

because this transaction has not yet posted, but your available balance would be $30 because you have committed to pay the restaurant $20. When the restaurant submits the transaction to us (which could be a few days later), we will post the payment transaction to your account and your actual balance will be reduced by $20.

(Exhibit H, Logix Membership and Accounts Agreement.)  Baxter Credit Union has  an account

contract which states that the "[a]vailable balance is used to determine when there are

insufficient funds to pay an item presented for payment from the account" and describes the

available balance as "generally equal to the actual balance, less the amount of any holds placed

on recent deposits, holds for other reasons, and holds for pending transactions (such as pending

debit card purchases) that the Credit Union has authorized but that have not yet posted to your

account."  (Exhibit I, BCU Member Services Agreement.)  Southland Credit Union's account

contract also states that for purposes of determining whether to assess an overdraft fee it, "[t]

akes into account factors such as holds placed on deposits and pending transactions (such as

pending debit card purchases) that the Credit Union has authorized but that have not yet posted

to your account."  (Exhibit J, Southland CU Member Account Agreement.)  Similarly, State

Employees Credit Union of Maryland discloses that for purposes of assessing an overdraft fee it,

"[t] takes into account things such as holds placed on deposits and decreases in your Available

Balance (such as pending debit card purchases) that you initiated and SECU has authorized but

that have not yet posted to your account."  (Exhibit K, SECU Maryland Account Agreement.)

MidFlorida Credit Union has put forward a separate Overdraft Agreement which states that it,

"[t]akes into account things like holds placed on deposits and pending transactions (such as

pending debit card purchases) that the Credit Union has authorized but that have not yet posted

to your account."  (Exhibit L, MidFlorida Overdraft Agreement.)  Point Loma Credit Union

explains in its account contract that for purposes of assessing overdraft fees "[a]ny purchases,

holds, fees, other charges, or deposits made on my account that have not yet posted will not appear in my actual balance." (Exhibit M, Point Loma CU's Courtesy Pay Disclosures.) San Diego County Credit Union's account contract states that in determining whether an overdraft fee will be assessed against a member, "[w]e will consider all transactions that have posted to your account, any holds that may be in place on deposits you have made, and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account." That contract also contains a section on authorization holds, titled, "Authorization Holds for Debit Card Transactions," which states, "[w]e generally place a temporary hold against some or all of the funds in the account linked to your debit card if and when an authorization request is obtained," and that "[t]he amount of the authorization hold will be subtracted from your available balance." (Exhibit N, SDCCU Account Agreement.) In contrast to these account contracts, and dozens of others across the country, SCU's Account Agreement stated no such thing, not even remotely, prior to at least March 2017.

43.    Likewise, numerous financial institutions that engage in the abusive practice of charging repeat NSF fees for the same "item" also plainly and clearly disclose it in their Account Agreements and Fee Schedules.

44.    For example, Air Academy Federal Credit Union an NSF fee is "$32.00 **per presentment**." *See* https://www.aafcu.com/fees.html (emphasis added) [last viewed March 24, 2020].

45.    Central Pacific Bank contracts unambiguously:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

*See* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf (emphasis added) [last viewed March 24, 2020].

46.    Delta Community Credit Union states its NSF fee is "$35 **per presentment**."  *See* https://www.deltacommunitycu.com/home/fees.aspx (emphasis added) [last viewed March 24, 2020].  Further, in its Account Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account.  **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

*See* https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx (emphasis added) [last viewed March 24, 2020].

47.    Glendale Federal Credit Union lists its NSF fee as "$30 **per presentment**."  *See* https://glendalefcu.org/pdf/fees.pdf  (emphasis added) [last viewed March 24, 2020].

48.    First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment).  **Each presentment is considered an item and will be charged accordingly**."

*See* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last viewed March 24, 2020].

49.    First Northern Credit Union lists its NSF fee as "$22.00 per each presentment and any subsequent representment(s)."  *See* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count (emphasis added) [last viewed March 24, 2020].  Further, in its Account Agreement, First Northern

unambiguously states as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**. For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again. If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item. You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**.

*See*

https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf

(emphasis added) [last viewed March 24, 2020].

50.    Liberty Financial states its NSF fee is "27.00 **per presentment**." *See*

https://liberty.financial/about/fee-schedule (emphasis added) [last viewed March 24, 2020].

51.    Los Angeles Federal Credit Union lists its NSF fee as "$29 **per presentment**."

*See* https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added) [last viewed March 24, 2020].

52.    Members First Credit Union states:

> We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** . . . .

21

*See* http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf

(emphasis added)  [last viewed March 24, 2020].

    53.    Meriwest Credit Union lists its fee as "$35.00/item **per presentment**."  *See*

https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.pdf

(emphasis added) [last viewed March 24, 2020].

    54.    Partners 1st Federal Credit Union states:

> Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*See* https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf

(emphasis added) [last visited March 24, 2020].

    55.    Regions Bank states:

> If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

*See* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf (emphasis added) [last viewed March 24, 2020].

    56.    Tyndall Federal Credit Union lists its NSF fee as "$28.00 **per presentment**

(maximum 5 per day)."  *See* https://tyndall.org/member_center/document_center/fee_schedule

(emphasis added) [last viewed March 24, 2020].

57.     USE Credit Union states "**Fees are charged per presentment, meaning the same item is subject to multiple fees if presented for payment multiple times**."  *See* https://www.usecu.org/home/fiFiles/static/documents/Schedule_of_Fees.pdf (emphasis added) [last viewed March 24, 2020].

58.     In contrast to these Account Agreements and Fee Schedules, SCU's Account Agreement stated no such thing prior to at least April 2019, and its Fee Schedule still does not contain this language.

59.     Further, with regard to the Opt-In Agreement, Plaintiff anticipates that SCU might try to argue that it was required by Regulation E to use the language it used.  But Regulation E contains no such requirement to use the language: "[a]n overdraft occurs when you do not have enough money in your checking account to cover a transaction, but we pay it anyway."  In fact, numerous banks and credit unions which use an "artificial available balance" method to determine when accounts are overdrawn, have adopted language in their Opt-In Agreements that affirmatively discloses this, showing that Regulation E does not prevent explaining what "available balance" means.  For instance, TD Bank's Opt-In Agreement, which is attached hereto as Exhibit O, states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway.  **Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy**." (Emphasis added.)  Another example is Credit Union 1, another Illinois credit union, which states in its Opt-In Agreement, "An overdraft occurs when you do not have enough available money (i.e. less holds) in your checking account to cover a transaction, but we pay it anyway." (Exhibit P, Credit Union 1 Opt-In Agreement.)  Similarly, Communications Federal Credit

Union's Opt-In Agreement, which is attached hereto as Exhibit Q, states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway.  **'Available Balance' is your account balance less any holds placed on your account.**" (Emphasis added.)  Attached as Exhibit R is the Opt-In Agreement for San Diego County Credit Union, recognizing that "available balance" is at best an ambiguous term, explains on that same page, as follows: "In determining your available balance **we will consider** all transactions that have posted to your account, **any holds that may be in place on deposit you have made and pending transactions (such as pending debit card purchases) that have been authorized but not yet posted to your account**." (Emphasis added.)  Attached as Exhibit S is the Opt-In Agreement for EECU, and it explains for five-pages on the same form requiring signature pursuant to Regulation E for overdraft coverage, including on page two, that " My available balance takes into account holds that have been placed on deposits and pending transactions (such as pending debit card transactions) that the credit union has authorized but that have not yet posted to my account.  **In other words, the available balance is my actual balance less any pending ATM withdrawals, debit card purchases, ACH transaction, checks being processed or other pending withdrawals from my account and less any deposits that are not yet available due to the credit union's funds availability policy.**" (Emphasis in original.)  There are countless other examples of financial institutions explaining in the Opt-In Agreement accurately on what basis the financial institution will impose overdraft fees.  SCU could have accurately described its overdraft program in its Opt-In Agreement and violated Regulation E by charging any overdraft fees whatsoever on ATM and one-time debit card transactions given that it did not accurately describe its overdraft program in the required notice.

60.     The CFPB in a recent Federal Interagency Compliance Discussion regarding improper overdraft fees, condemned exactly the sort of conduct being challenged by Plaintiff in this lawsuit, and called what Defendant was doing here during the relevant class period an "Unfair Practice":



(Excerpts from Interagency Overdraft Services Consumer Compliance Discussion, dated Nov. 9, 2016.)

61.     As shown, the CFPB has actually condemned as deceptive one of the very practices at issue in this case.

62.     Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in 2019.  While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until 2019 because SCU hid its actual practice from its members by describing a different practice in its contracts and other materials disseminated to its members.  This not only reasonably delayed discovery, but SCU's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop SCU.

63.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

64.     Plaintiff and the Class Members were harmed by SCU's policy and practice of charging overdraft and NSF fees when there was money in members' accounts to cover the transaction, and also when SCU charged an NSF fee more than once for the same "item."  By doing so, SCU breached its contracts with Plaintiff and the absent Class Members.  It will be necessary to obtain SCU's records to determine each instance of such a wrongful overdraft and NSF fee; however, Plaintiff has already uncovered some examples:

| Post Date | Check | Description | Debit | Credit | Status | Balance |
|---|---|---|---|---|---|---|
| 12/29/2015 | | Withdrawal Courtesy Pay fee | 27.00 | | Posted | -94.74 |
| 12/29/2015 | | Withdrawal Courtesy Pay fee | 27.00 | | Posted | -50.13 |
| 12/29/2015 | | Withdrawal Courtesy Pay fee | 27.00 | | Posted | 22.14 |
| 12/29/2015 | | Withdrawal Debit Card/FREDS 00024836 MARION ILDate 12/28/15 0 5362014388 0 5912Card 5599 | 17.61 | | Posted | -67.74 |
| 12/29/2015 | | Withdrawal Debit Card/TRACFONE *AIRTIME TRACFONE.COM FLDate 12/29/15 0 5363014386 0 4814Card 5599 | 45.27 | | Posted | -23.13 |
| 12/29/2015 | | Withdrawal NSF  001179/In the amount $675.00. | 27.00 | | Posted | 69.34 |
| 12/29/2015 | | Withdrawal POS #036396/ALDI 41001 0624 1305 NORTH RUSSELL STMARION ILCard 5599 | 20.20 | | Posted | 49.14 |
| 12/23/2015 | | Withdrawal NSF  001179/In the amount $675.00. | 27.00 | | Posted | 96.34 |

65.     As shown in the chart above, on December 29, 2015, despite there being only a negative balance for two transactions for a total of $62.88, Plaintiff was charged a total of three "Courtesy Pay" overdraft fees for a total of $81.00.  It is believed that this was a result of not

using the actual balance to determine the overdraft fees.  Regarding repeat NSF fees, on

December 23, 2015, SCU charged Plaintiff a $27.00 NSF fee when it was presented with item

"001179" in the amount of $675.00.  SCU then charged a second $27 NSF fee for the same item

on December 29, 2015.  These are just a couple of examples for illustrative purposes.  Plaintiff

has a reasonable belief that discovery and a complete review of SCU's records, including

Plaintiff's monthly statements and transaction history, will show multiple instances in which

SCU improperly charged Plaintiff overdraft and NSF fees for transactions despite the fact that

she had enough money in her account to cover the transactions, and repeat NSF fees for the same

items.

66.    Moreover, the assessment and unilateral taking of improper overdraft fees and

NSF fees further reduces the balance and amount of funds in an account, resulting in and

aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated

as transactions for which SCU assesses further overdraft or NSF fees.  This practice was deemed

to be deceptive and substantially harmful to customers by the CFPB, which made the following

conclusions in its studies:

> Examiners also observed at one or more institutions the following
> sequence of events after the institutions switched balance-
> calculation methods: a financial institution authorized an electronic
> transaction, which reduced a customer's available balance but did
> not result in an overdraft at the time of authorization; settlement of
> a subsequent unrelated transaction that further lowered the
> customer's available balance and pushed the account into overdraft
> status; and when the original electronic transaction was later
> presented for settlement, because of the intervening transaction and
> overdraft fee, the electronic transaction also posted as an overdraft
> and an additional overdraft fee was charged. Because such fees
> caused harm to consumers, one or more supervised entities were
> found to have acted unfairly when they charged fees in the manner
> described above. Consumers likely had no reason to anticipate this
> practice, which was not appropriately disclosed. They therefore
> could not reasonably avoid incurring the overdraft fees charged.

> Consistent with the deception findings summarized above,
> examiners found that the failure to properly disclose the practice of
> charging overdraft fees in these circumstances was deceptive.

(Supervisory Highlights, Winter 2015 at pp. 8-9.)  A complete evaluation of SCU's records is

necessary to determine the full extent of Plaintiff's harm from this practice.

67.    Additionally, because the Opt-In Agreement did not describe SCU's actual

overdraft service, let alone in a "clear and readily understandable" manner as required by 12

C.F.R. §205.4 (a)(1), SCU violated Regulation E by charging overdraft fees on ATM and non-

recurring debit card transactions.  Because it failed to provide the full and accurate disclosures to

Plaintiff required by Regulation E, SCU failed to obtain Plaintiff's fully informed consent as

required by Regulation E in order for SCU to be authorized to charge such overdraft fees.

Because SCU was not legally authorized to enroll Plaintiff into the Courtesy Payment program

for non-recurring debit card and ATM transactions, SCU violated Regulation E when it assessed

*any* overdraft fees against Plaintiff for non-recurring debit card and ATM transaction, and

Plaintiff was harmed as a result.  A complete evaluation of SCU's records is necessary to

determine the full extent of Plaintiff's harm from this practice as well.

68.    Plaintiff was harmed by these practices when she was assessed overdraft fees and

NSF fees when she should not have been.  A complete review of SCU's records is necessary to

determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

69.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

70.    Plaintiff brings this case, and each of her respective causes of action, as a class

action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2) and (b)(3) on

behalf of the following Class.

71.    The "Class" is composed of three classes:

**The Account Balance Class:**

> **All United States residents who have or have had accounts with SCU who incurred an overdraft fee or NSF fee when the balance in the checking account was sufficient to cover the transaction during the period beginning ten years preceding the filing of this Complaint, and ending on the date the Class is certified.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010, and ending on the date the Class is certified.**

**The Repeat NSF Class:**

> **All United States residents who have or have had accounts with SCU who incurred an NSF fee more than once for the same item during the period beginning ten years preceding the filing of this Complaint and ending on the date the Class is certified.**

72.    Excluded from the Class are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class Members.

73.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23.

74.    **Numerosity (Federal Rules of Civil Procedure, Rule 23(a)(1))** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of

members based on the fact that SCU has approximately $1.2 billion in assets and operates approximately 17 branches in Illinois and Missouri with over 144,000 members.

75.     Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of SCU's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

76.     **Commonality (Federal Rules of Civil Procedure, Rule 23(a)(2))** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

a.     Whether, pursuant to the Opt-In Agreement, Defendant promised to Plaintiff and the Class Members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

b.     Whether, pursuant to the Account Agreement, Defendant promised to Plaintiff and the Class Members that it would not charge an overdraft fee or NSF fee if there was enough money in the account to cover the transaction;

c.     Whether, pursuant to the Account Agreement, Defendant promised to Plaintiff and the Class Members that it would only charge "a" fee for an NSF "item" rather than charge repeat NSF fees each time the same "item" was

presented for payment;

       d.     Whether Defendant breached the Opt-In Agreement and/or Account Agreement by assessing overdraft fees for transactions when customers' accounts contained enough money to cover the transaction;

       e.     Whether Defendant breached the Account Agreement by assessing NSF fees for transactions when customers' accounts contained enough money to cover the transactions;

       f.     Whether, pursuant to the Account Agreement and Fee Schedule, Defendant contracted it would charge an NSF fee "per item;"

       g.     Whether Defendant breached the Account Agreement or Fee Schedule by assessing repeat NSF fees each time the same "item" was presented for payment;

       h.     Whether the language in the Opt-In Agreement described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees;

       i.     Whether the language in the Account Agreement is ambiguous;

       j.     Whether the language in the Opt-In Agreement is ambiguous;

       k.     Whether Defendant is liable under claims of unjust enrichment, money had and received, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act; and

       l.     Whether Defendant's conduct violated 12 C.F.R. § 1005.17 (Regulation E).

77.    **<u>Typicality (Federal Rules of Civil Procedure, Rule 23(a)(3))</u>** – Plaintiff's

claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because all of the relevant contracts between Defendant and its members, including the Account Agreement, Opt-In Agreement, and Fee Schedule, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees or NSF fees when there were sufficient funds in the accounts to pay for the transactions at issue, and of assessing multiple NSF fees for the same electronic item, are uniform for Plaintiff and all Class Members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

78.    **<u>Adequacy (Federal Rules of Civil Procedure, Rule 23(a)(4))</u>** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and her counsel intend to prosecute this action vigorously.

79.    **<u>Predominance and Superiority (Federal Rule of Civil Procedure, Rule 23(b)(3))</u>** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any

individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

80.    Plaintiff is not aware of any separate litigation instituted by any of the Class Members against Defendant. Plaintiff does not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because both Plaintiff and Defendant reside in this District, and because the claims arose from activities which occurred primarily in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

81.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of

the instant action, to the proposed Class Members.  Upon information and belief, Defendant's

own business records and/or electronic media can be utilized for the contemplated notices.  To

the extent that any further notices may be required, Plaintiff anticipates the use of additional

media and/or mailings.

82.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the

Federal Rules of Civil Procedure, in that:

a.      Without class certification and determination of declaratory, injunctive,

statutory and other legal questions within the Class format, prosecution of separate

actions by individual members of the Class will create the risk of:

1.    Inconsistent or varying adjudications with respect to individual

members of the Class which would establish incompatible standards of conduct

for the parties opposing the Class; or

2.    Adjudication with respect to individual members of the Class,

which would as a practical matter be dispositive of the interests of the other

members not parties to the adjudication or substantially impair or impede their

ability to protect their interests. The parties opposing the Class have acted or

refused to act on grounds generally applicable to each member of the Class,

thereby making appropriate final injunctive or corresponding declaratory relief

with respect to the Class as a whole.

b.      Common questions of law and fact exist as to the members of the Class

and predominate over any questions affecting only individual members, and a class

action is superior to other available methods of the fair and efficient adjudication of the

controversy, including consideration of:

1.   The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2.   The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3.   The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4.   The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION
### (Breach of The Opt-In Agreement and Breach of the Implied Covenant of Good Faith and Fair Dealing)

83.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

84.   Plaintiff and each of the Class Members entered into the Opt-In Agreement with Defendant covering the subject of overdraft fees.  This contract was drafted by and is binding upon Defendant.

85.   In the Opt-In Agreement, Defendant promised that it would assess overdraft fees only when there was not enough money in the account to cover the transaction.

86.   The contract incorporated by reference all applicable laws regarding its subject matter, including 12 C.F.R. § 1005.17, which mandates that all Opt-In Agreements for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice, and bars financial institutions from assessing fees for non-recurring debit card and ATM transactions if they have not fully complied with that section's requirements.

87.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-In Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

88.     Defendant breached the express terms of the Opt-In Agreement by, *inter alia*, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

89.     Additionally, the implied covenant of good faith and fair dealing is an element of every contract.  Under the implied covenant, parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  The parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

90.     SCU has breached the implied covenant of good faith and fair dealing in the Opt-In Agreement through its abusive overdraft fee policies and practices as alleged herein.  Instead of exercising any discretion that it has in good faith and consistent with Plaintiff's and Class Members' reasonable expectations, SCU abused that discretion to assess overdrafts and take money out of their checking accounts without their permission and contrary to their reasonable expectations that they would not be charged overdraft fees when they had money in their accounts.  Defendant had the unilateral power and could easily have avoided acting in this manner by simply changing the programing in its software to charge overdraft fees only when there really was not enough money in the account to cover the transaction in question.  Instead,

Defendant unilaterally elected to and did program its software to create an accounting gimmick, the "artificial available balance," which would maximize its overdraft fees. In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contracts.

91.     By exercising its discretion to enrich itself and gouge its customers as it did, SCU consciously and deliberately frustrated the agreed common purposes of the contract and reasonable expectations of the Plaintiff and Class Members, thereby depriving them of the benefit of their bargain.

92.     To the extent the Opt-In Agreement does not explicitly bar the policy described herein, SCU exploited any contractual discretion to the detriment of accountholders and breached good faith and fair dealing when it used the policy. The allegations that SCU has contractual discretion are made in the alternative to the allegations that the overdraft practices are expressly in breach of the contracts.

93.     As a proximate result of Defendant's breach of the Opt-In Agreement, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of the Account Agreement and Breach of the Implied Covenant of Good Faith and Fair Dealing)

94.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

95.     Plaintiff and each of the Class Members entered into the Account Agreement, attached hereto as Exhibit A, with Defendant covering the subject of overdraft and NSF fees.

This contract was drafted by and is binding upon Defendant.

96.    In the Account Agreement, prior to March 2017, Defendant promised that SCU would assess overdraft or NSF fees only when SCU "pay[s] . . . items presented against our member's checking account [that] . . . cause[] the account to become overdrawn." Nowhere did the Account Agreement explain what it means for an account to be "overdrawn" or state that SCU would create an artificial system by which it would deduct pending debit card transactions or holds on deposits for purposes of determining whether an account was overdrawn such that an overdraft or NSF fee would be assessed.

97.    Further, prior to April 2019, nowhere did the Account Agreement state that SCU would assess an additional NSF fee every time an electronic item was presented for processing, or submitted as a "retry." SCU wrongfully treated a "retry" as a new and separate "item" in violation of the terms of the Account Agreement.

98.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

99.    Defendant breached the express terms of the Account Agreement by, *inter alia*, assessing overdraft or NSF fees when there were sufficient funds in the account to cover the transaction or transactions at issue, and by assessing multiple NSF fees for the same electronic transaction or item.

100.    Additionally, the implied covenant of good faith and fair dealing is an element of every contract. Under the implied covenant, parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with

a discretionary power over the other party.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  The parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

101.    SCU has breached the implied covenant of good faith and fair dealing in the Account Agreement through its abusive overdraft and NSF fee policies and practices as alleged herein.  Instead of exercising any discretion that it has in good faith and consistent with Plaintiff's and Class Members' reasonable expectations, SCU abused that discretion to assess overdraft and NSF fees and take money out of their checking accounts without their permission and contrary to their reasonable expectations that they would not be charged multiple NSF fees for the same item. Defendant could easily have avoided acting in this manner by simply changing the programing in its software to charge overdraft fees and NSF fees only when there really was not enough money in the account to cover the transaction in question.  Instead, Defendant unilaterally elected to and did program its software to create an accounting gimmick, the "artificial available balance," which would maximize its overdraft and NSF fees.  It also implemented a policy which it controlled the of charging multiple NSF fees on the same attempted item.  In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft and NSF fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contracts.

102.    By exercising its discretion to enrich itself and gouge its customers as it did, SCU consciously and deliberately frustrated the agreed common purposes of the contract and reasonable expectations of the Plaintiff and Class Members, thereby depriving them of the

benefit of their bargain.

103.   To the extent the Account Agreement does not explicitly bar the policies described herein, SCU exploited any contractual discretion to the detriment of accountholders and breached good faith and fair dealing when it used the policy.  The allegations that SCU has contractual discretion are made in the alternative to the allegations that the overdraft and NSF fee practices are expressly in breach of the contracts.

104.   As a proximate result of Defendant's breach of the Account Agreement, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

<u>**THIRD CAUSE OF ACTION**</u>
**(Unjust Enrichment/Restitution)**

105.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

106.   As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

107.   The CFPB has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an unfair, deceptive, or abusive act or practice.  (Consumer Financial Protection Bureau, *Bulletin 2013-07*, at p. 2  (July 10, 2013) (defining unfair, deceptive, or abusive acts or practices based on the FTC balancing test as: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to

competition").) [4]

108.    Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees, including repeat NSF fees, assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

### FOURTH CAUSE OF ACTION
#### (Money Had and Received)

109.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

110.    Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

111.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

---

[4] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf [last viewed March 12, 2020].

**FIFTH CAUSE OF ACTION**
**(Violation of Electronic Fund Transfer Act (Regulation E), 12**
**C.F.R. §§ 1005, *et seq*.  (authority derived from 15 U.S.C.**
**§§ 1693, *et seq*.))**

112.  The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

113.  By charging overdraft fees on ATM and nonrecurring transactions, SCU violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act [15 U.S.C. §§ 1693, *et seq*.], the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

114.  Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E.  12 C.F.R. § 1005.17. The Opt In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  *Id*. (emphasis added).  The notice "shall be clear and readily understandable."  12 C.F.R. § 1005.4(a)(1).  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

115.  The intent and purpose of this Opt-In Agreement is to "assist customers in

understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

116.    SCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  SCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers in a "clear and readily understandable way" a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17.  SCU's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but SCU pays it anyway, when, in fact, SCU assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.

117.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so, SCU has harmed Plaintiff and the Class Members.

118.    As the result of SCU's violation of Regulation E, 12 C.F.R. § 1005.17, Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C.A. § 1693m.

## SIXTH CAUSE OF ACTION
### (Violation of 815 ILCS §§ 505/1, *et seq*., The Illinois Consumer Fraud and Deceptive Business Practices Act)

119.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

120.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq*., provides protection to consumers by mandating fair competition in commercial markets for goods and services.  The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act." 815 ILCS § 505/2.

121.    The ICFA applies to Defendant's acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

122.    Defendant is a "person" as defined by section 505/1(c) of the ICFA.

123.    Plaintiff and each of the Class members are "consumers" as defined by section 505/1(e) of the ICFA.  Plaintiff and each Class Member are natural persons who primarily for personal use, or for that of a member of their households, purchased banking account services from Defendant.

124.    The actions and/or omissions of Defendant in relation to its overdraft and NSF fee practice were unfair and constitute deceptive acts and practices prohibited by the ICFA.

Specifically, SCU engaged in an unfair and deceptive practice of assessing overdraft and NSF fees when there was enough money in its customers' accounts to pay for the transactions in question, in direct contradiction of its promises to those customers, affecting Plaintiff and members of the Class. SCU failed to inform its customers as to what the lesser, artificial available balance was, or how it differed from the real balance in the account, and by concealing this information from its customers, SCU was able to increase its profits due to the unlawful assessment overdraft and NSF fees. SCU was capable of explaining the difference in these balances to its customers, as is evident from its March 2017 Account Agreement, but opted not to do so earlier because misrepresenting how its overdraft practice worked was more profitable.

125.    Specifically, Defendant failed to disclose in its contracts and through other disclosures that it used the "artificial available balance" to assess overdraft and NSF fees, and that it assessed repeated NSF fees on single items. These were deceptive acts, omissions, and/or practices because they were designed to mislead customers and drive up the number of assessed overdraft and NSF fees.

126.    Moreover, in misrepresenting the actual nature of its overdraft program, SCU failed to obtain the informed consent of the enrollees to the program. This deliberate misrepresentation precludes SCU from assessing any overdraft fees on ATM and non-recurring debit transactions pursuant to Regulation E. This unlawful taking constitutes unfair and deceptive practices in violation of the ICFA.

127.    Defendant's deceptive actions and omissions were in the conduct of trade or commerce.

128.    As a proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek

relief as set forth in the Prayer below.

129.    Had Plaintiff and Class Members known the actual facts or legal implications of those acts, they could have avoided the overdraft and NSF fees.  Therefore, a causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiff and the members of the Class.

## **PRAYER**

WHEREFORE, Plaintiff and the Class prays for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For punitive damages under the ICFA;

4.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

5.    For statutory damages;

6.    For an order enjoining the wrongful conduct alleged herein;

7.    For costs;

8.    For pre-judgment and post-judgment interest as provided by law;

9.    For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

10.    For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.


Dated: March 24, 2020                              Respectfully Submitted,

                                                   s/ *Derek Y. Brandt*
                                                   Derek Y. Brandt, IL Bar No. 6228895
                                                   dyb@mccunewright.com
                                                   Emily J. Kirk, IL Bar No. 6275282
                                                   ejk@mccunewright.com
                                                   Leigh M. Perica, IL Bar No.: 6316756
                                                   lmp@mccunewright.com
                                                   **McCune Wright Arevalo, LLP**
                                                   231 N. Main Street, Suite 20
                                                   Edwardsville, IL 62025
                                                   Telephone:  (618) 307-6116
                                                   Facsimile:  (618) 307-6161

                                                   Richard D. McCune, CA Bar No. 132124*
                                                   rdm@mccunewright.com
                                                   David C. Wright, CA Bar No. 177468 *
                                                   dcw@mccunewright.com
                                                   **McCune Wright Arevalo, LLP**
                                                   3281 East Guasti Road, Suite 100
                                                   Ontario, CA 91761
                                                   Telephone:  (909) 557-1275
                                                   Facsimile:  (909) 557-1275

                                                   Taras Kick, CA Bar No. 143379*
                                                   Taras@kicklawfirm.com
                                                   **THE KICK LAW FIRM, APC**
                                                   815 Moraga Drive
                                                   Los Angeles, California 90049
                                                   Telephone:     (310) 395-2988
                                                   Facsimile:     (310) 395-2088

                                                   Attorneys for Plaintiff JoAnna Toth,
                                                   and the Putative Class

                                                   **Pro Hac Vice* applications to be submitted