IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOANNA TOTH, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. 20-CV-00306-SPM |
| SCOTT CREDIT UNION and DOES 1-100, | |
| Defendants. | |

# MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Plaintiff JoAnna Toth filed a proposed class action Complaint alleging that defendants, Scott Credit Union and Does 1–100 ("SCU"), charged SCU members fees that ran counter to SCU's own contracts and violated state and federal laws (Doc. 1). Pending before the Court is SCU's Motion to Dismiss ("MTD") the Complaint and a memorandum in support of dismissal (Docs. 19, 20). For the reasons set forth below, the Court grants the Motion.

FACTUAL & PROCEDURAL BACKGROUND

I. The Complaint

The following facts are taken from Toth's Complaint and the Court views them as true for the purposes of this motion. SCU is a federally-chartered Illinois-based credit union with branches in Illinois and Missouri that offers its members checking accounts along with debit cards for transactions on the accounts (Doc. 1, pp. 2, 4).

During the ten-year period prior to the filing of this suit, Toth had a checking account with SCU (*Id.* at 29). Toth alleges that SCU assessed overdraft fees even though her account had sufficient funds to cover the transactions and that this practice is contrary to the express terms SCU contracted for with members (*Id.* at 7, 9, 12).[1] She pointed to one example from December 29, 2015 where she claims she had a positive balance but SCU charged her three overdraft fees in relation to three purchases (*Id.* at 26-7). Toth further claims that SCU charged multiple NSF fees for one purchase when retailers re-submitted the same transaction, also contrary to the contract terms (*Id.* at 12-13). She discussed one example from December 23, 2015, where she attempted to charge a $675 purchase and SCU charged an NSF fee that day and another NSF fee a few days later (*Id.* at 27).

Toth claims that these practices breached the terms of the contracts governing SCU's overdraft and NSF program and that it violated Regulation E of the Electronic Funds Transfer Act ("EFTA"), *see* 12 C.F.R. § 1005.17, because SCU failed to properly disclose these policies to customers. Additionally, Toth alleges that SCU breached the implied covenant of good faith and fair dealing and engaged in unfair and deceptive business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), *see* 815 ILCS 505/1. Toth also asserts quasi-contract claims for equitable relief in the alternative to her breach of contract claim.

---

[1] According to one document attached to the Complaint, a non-sufficient funds ("NSF") fee is applied to overdrafts (Doc. 1-3, p. 24), while in another, overdraft and NSF fees are discussed separately (Doc. 1-5, p. 2). An NSF fee is usually distinct from an overdraft fee in that it is assessed where a bank rejects, instead of paying, an attempted transaction because of the insufficient balance of a customer's checking account. For clarity, the Court will refer to these fees separately. Both fees are a $27 assessment (Doc. 1-5, p. 2).

SCU moves to dismiss the breach of contract claims, arguing that the Account Agreement and Opt-In Agreement, construed together, unambiguously state that SCU would use the available balance method in assessing overdraft fees. SCU also contends that multiple NSF fees were contemplated in the documents. SCU also moves to dismiss the Regulation E claim on the ground that it is untimely. SCU additionally moves to dismiss the implied covenant of good faith and fair dealing claims, quasi-contract claims, and ICFA claim on the grounds that they cannot be maintained where Toth has conceded that an express contract controls the parties' relationship.

## II.     Relevant Contract Terms

### A. The 2013 Account Agreement

The Account Agreement from 2013 states in relevant part:

**FUNDS AVAILABILITY POLICY**

This disclosure describes your ability to withdraw funds at Scott Credit Union. It only applies to the availability of funds in transaction accounts. The credit union reserves the right to delay the availability of funds deposited to accounts that are not transaction accounts for periods longer than those disclosed in this policy. Please ask us if you have a question about which accounts are affected by this policy.

**Your Ability To Withdraw Funds** - Our policy is to make funds from your cash and check deposits available to you on the first business day after the day we receive your deposit. Electronic direct deposit will be available on the day we receive the deposit. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written. For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. If you make a deposit before 11:59PM on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after 11:59PM or on a day we are not open, we will consider that the deposit was made on the next business day we are open.

**Holds on Other Funds (Check Cashing)** - If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it (either 2 or 11 business days).

**Holds on Other Funds (Other Account)** - If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

**Longer Delays May Apply** - In some cases, we will not make all of the funds that you deposit by check available to you on the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $200 of your deposits, however, may be available on the first business day.

. . . .

### SHARE DRAFT (CHECKING) ACCOUNT

. . . .

**Courtesy Pay** - is a service that allows us to pay checks and ACH items presented against our member's checking account even if it causes the account to become overdrawn. If you choose, this service can also be used to pay every day Debit Card transactions. Courtesy Pay may provide certain accountholders in "good standing" with the ability to overdraw their checking account up to $500. The Courtesy Pay limit includes any overdraft fees assessed.

. . . .

Courtesy Pay offers additional flexibility and convenience in managing accountholder funds, and provides peace of mind knowing that items may be paid up to the authorized overdraft limit. Using Courtesy Pay may be more costly than other overdraft payment options we may offer. Please speak to a representative to see if you qualify.

This non-contractual courtesy of paying check and ACH overdrafts requires no accountholder action. An Opt-In selection is required to include everyday Debit Card transactions with this service. It is not a loan. No additional agreements need to be signed, and it costs nothing unless the privilege is used - by initiating checks, electronic funds transfers, or other payment or withdrawal requests for more than is on deposit in the account. If you maintain the account in good standing and have need for this "courtesy", we may, at our sole discretion, pay the

item(s) up to the authorized limit, and we will charge the account our normal Non-Sufficient Funds charge for each item that overdraws the account. If your account does not remain in good standing, we may withdraw this "courtesy" until we determine your account is in good standing. Unless you have applied for and received an overdraft line of credit, we do not have to pay your overdrafts. However, if you do not have an overdraft line of credit, or do not want us to overdraw your account under any circumstances even as a courtesy to clear an item that you have written, you must tell us not to do so.

(Doc. 1-3, pp. 21-2, 26-7)

### B. The 2017 Account Agreement

The Account Agreement from 2017 states in relevant part:

**14. OVERDRAFTS -**

**a. Payment of Overdrafts.** If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. The Credit Union's determination of an insufficient available account balance may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient available funds in order to pay an item. Your account may be subject to a charge for each item regardless of whether we pay or return the item.

. . . .

**c. Understanding Your Account Balance.**

. . . .

**- Signature-Based Debit Card Purchase Transactions.** These are purchase transactions using your debit card that are processed through a signature-based network. Rather than entering a PIN, you typically sign for the purchase; however, merchants may not require your signature for certain transactions. Merchants may seek authorization for these types of transactions. The authorization request places a hold on funds in your account when the authorization is completed. The "authorization hold" will reduce your available balance by the amount authorized but will not affect your actual balance. The transaction is subsequently processed by the merchant and submitted to us for payment. This can happen hours or sometimes days after the transaction, depending on the merchant and its payment processor.

> These payment requests are received in real time throughout the day and are posted to your account when they are received. The amount of an authorization hold may differ from the actual payment because the final transaction amount may not yet be known to the merchant when you present your card for payment. For example, if you use your debit card at a restaurant, a hold will be placed in an amount equal to the bill presented to you; but when the transaction posts, it will include any tip that you may have added to the bill. This may also be the case where you present your debit card for payment at gas stations, hotels and certain other retail establishments. We cannot control how much a merchant asks us to authorize, or when a merchant submits a transaction for payment. This is a general description of certain types of transactions. These practices may change, and we reserve the right to pay items in any order we choose as permitted by law.

(Doc. 1-4, p. 7-8).

### C. The Opt-In Agreement

The parties also focus on the Opt-In Agreement, which, according to the Complaint, states that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway" (Doc. 1, p. 11).[2]

## LEGAL STANDARD

SCU moves to dismiss the Complaint under Rule 12(b)(6). A plaintiff's complaint must contain sufficient factual matter that states a claim that is "plausible on its face." FED. R. CIV. P. 8(a)(2); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Taken together, the factual allegations contained within a complaint must "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 554-55 (2007) (internal citations

---

[2] SCU attached the Opt-In Agreement to its MTD. For the sake of comparison, the attached Opt-In Agreement states that "[a]n overdraft occurs when your account does not have enough money for a transaction, but we pay it anyway" (Doc. 20-1).

omitted); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[T]rial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."). Complaints that contain only "naked assertion[s] devoid of further factual enhancement" will not suffice. *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted).

Further, courts "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (citation and internal quotation marks omitted). On the other hand, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [during the pleading stage] we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 889 (1990)).

## ANALYSIS

### I. Contract-Related Claims (Counts I and II)

#### A. Breach of Contract

To state a claim for breach of contract under Illinois law, a plaintiff must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)).

Toth claims that the Opt-In Agreement and the Account Agreement should be viewed separately as distinct breach of contract claims (Doc. 1, pp. 35, 37). In Illinois, instruments executed as parts of the same transaction, even at different times, between the same contracting parties will be read together and construed as constituting a single instrument. *IFC Credit Corp. v. Burton Indus., Inc.*, 536 F.3d 610, 614 (7th Cir. 2008); see also *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (2007).

The Opt-In Agreement states that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." The Opt-In Agreement does not define or explain what is meant by the phrase "when you do not have enough money in your account to cover a transaction." Toth argues that the plain, ordinary meaning of this phrase is that an overdraft would occur only when there was not enough money in the account to cover the transaction, shown by what she calls the balance or ledger balance.[3] SCU argues that the Opt-In Agreement is part of the Account Agreement and must be read in conjunction with that Agreement. When the documents are read together, SCU argues, the plain meaning of "enough money" is the available balance.

Standing alone, the Opt-In Agreement does not sufficiently define or explain the term "enough money" to put members on notice that "enough money" means the

---

[3] "Overdraft fees are tied to the customer's account balance." *Page v. Alliant Credit Union*, 2020 WL 5076690, at *3 (N.D. Ill. Aug. 26, 2020) (quoting *Domann v. Summit Credit Union*, 2018 WL 4374076, at *1 (W.D. Wis. Sept. 13, 2018)). There are two methods to determine if an account has sufficient funds to cover a transaction: (1) the ledger, or actual, balance method and (2) the available balance method. The difference between the two is that the actual balance reflects all of the money in an account, whereas the available balance reflects only the money not subject to a hold due to pending transactions.

available balance. As SCU points out, the Account Agreements do, however, specifically reference the Opt-In Agreement. Accordingly, the language of the Opt-In Agreement must be construed together with the Account Agreement for purposes of the breach of contract claims.

Next, Toth alleges that SCU breached the Agreements by charging overdraft fees when member accounts had sufficient funds and by assessing multiple overdraft fees for a single transaction. Largely at issue here is the 2013 Account Agreement.[4] The 2013 Account Agreement's Courtesy Pay section states that SCU may, at their discretion, pay for items that overdraw a customer's account and SCU will in turn charge the account an overdraft fee for each item (Doc. 1-3, p. 27). The Agreement describes "Courtesy Pay" as "a service that allows us to pay checks and [automated clearing house] items presented against our member's checking account even if it causes the account to become overdrawn" (*Id.*). The agreement further states that:

> [Opt-In] is required to include everyday Debit Card transactions with this service. It is not a loan . . . and it costs nothing unless the privilege is used - by initiating checks, electronic funds transfers, or other payment or withdrawal requests for more than is on deposit in the account.

(*Id.*). A different portion of the 2013 Account Agreement, the "Funds Availability Policy" ("FAP") section, explains the account holder's ability to withdraw funds, which applies to the "availability of funds in transaction accounts" (Doc. 1-3, p. 26). The

---

[4] Toth concedes that the 2017 and 2019 Account Agreements advise customers that the available balance of the account is used to assess funds availability and that pending transactions and holds may reduce a member's account balance and result in overdrafts (Doc. 1, pp. 10-11, ). Toth also attached these agreements to her complaint, and each agreement includes a detailed section entitled "Understanding Your Account Balance," which includes an explanation of available balance and its use to determine whether an SCU customer's account is overdrawn (Docs. 1-4 and 1-6, p. 7).

policy then explains to customers that there are limitations on the availability of funds, including monetary holds in the account on deposited checks and cashed checks (*Id.* at 26-7). SCU points to this in support of its argument, asserting that when the provisions are read together in context, the Agreement contemplates that the amount in the account is based on a lesser amount than the ledger balance, a subset of the ledger balance subject to holds in place based on these restrictions.

Under Illinois law, "[t]he primary objective in construing a contract is to give effect to the intent to the parties." *Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020) (quoting *Gallagher*, 874 N.E.2d at 58). The best indication of the parties' intent is the language of a contract alone, given its plain and ordinary meaning. *Id.* The threshold inquiry in contractual disputes is whether the contract is ambiguous. *Id.* (quoting *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998)). "A contract is not rendered ambiguous merely because the parties disagree on its meaning." *Id.* (quoting *Thompson v. Gordon*, 948 N.E.2d 39, 48 (2011)). However, it is ambiguous "if it is capable of being understood in more sense than one." *Id.* (quoting *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (1991)). While the court resolves ambiguities against the drafter, the court should not interpret a contract in a way that nullifies contract provisions. *Id.* (quoting *Thompson* 948 N.E.2d at 48).

SCU's argument prevails. The only reasonable way to interpret the contract is that SCU will assess overdraft fees based on the member's available balance, rather than the ledger balance. By its express terms, the FAP informs the member that the

entirety of funds deposited into the account will not necessarily be available on the same business day SCU received the deposit. The FAP also delineates a policy that cashing a check drawn from another bank may result in SCU withholding the availability of the corresponding amount of funds from the member's SCU account. This is similar in function to when a member uses a debit card to make a purchase and a hold is placed on funds while the purchase is cleared with the merchant, which Toth calls an "accounting gimmick" (Doc. 1, p. 8).

Giving the contract its plain and ordinary meaning, this section shows that a member's account may at times reflect a difference between the entirety of the account and the amount of funds that are available for the member to use. *Domann*, 2018 WL 4374076, at *6. Toth attached agreements from other financial institutions to the Complaint in an attempt to paint SCU's contract terms as ambiguous, but that does not in itself establish ambiguity in the contract here. Toth also differentiates between decisions in other districts and circuits to argue that the lack of use of the term "available funds" shows ambiguity. While true that the 2013 Account Agreement and Opt-In Agreement do not use the term "available funds" at all, the FAP makes clear that the word "available" has a specific meaning and that funds "available" in a customer's account may be a subset of the amount shown on the ledger balance. The FAP section is further linked to the Courtesy Pay section, and Opt-In Agreement, through the FAP's discussion of limitations on funds via accountholder actions, like cashing checks, that the Courtesy Pay section then indicates could cause the account to be overdrawn, triggering courtesy pay, and the associated fee, on overdrafts.

Like most contracts, this contract is imperfect. But the Court cannot deviate from the four corners of the contract unless there is ambiguity. The plain and ordinary meaning of the contract sets up a two-factor balance system that then allows for overdraft fees and other fees, which can be triggered by holds reflected on the account's balance as opposed to the entirety of the account. Therefore, relief is foreclosed and Toth's claim for breach on this argument is dismissed with prejudice.

Next, Toth asserts that SCU breached the 2013 and 2017 Account Agreements by assessing multiple NSF fees for a single transaction. Toth also asserts that she is unaware whether SCU's fee schedule was ever served on her. For NSF fees prior to the 2017 Account Agreement, SCU refers to the fee schedule that Toth attached to her Complaint that noted a $27 NSF charge "per item" (Doc. 1-5, p. 2). SCU argues that this language is unambiguous in showing that SCU and Toth contracted for multiple NSF fees due to transactions returned for insufficient funds that are later reprocessed by the merchant. Service issue aside, SCU's argument that the fee schedule is unambiguous because it authorizes an NSF fee "per item" that overdraws an account is unpersuasive. The ambiguity here pertains to what qualifies as an "item" to begin with, not whether NSF fees may be incurred for each of them.

Regarding the 2017 Account Agreement, SCU highlights a section that informs the customer that fees will result for any "check, draft, transaction, or other item" if the member's available balance is insufficient (Doc. 1-4, p. 7). It then says that the member's account "may be subject to a charge for each item regardless of whether we pay or return the item" and that it "cannot control how much a merchant asks us to

authorize, or when a merchant submits a transaction for payment." (*Id*.). The Agreement then identifies the NSF fee as $27 (*Id.* at 18).

The language in these provisions, taken together, gives warning to members that SCU cannot control merchant reprocessing of returned items, giving greater clarity to what qualifies as an item and what "per item" includes when SCU charges an NSF fee. The disclaimer itself shows that SCU now includes returned items reprocessing by the merchant as an item capable of triggering an NSF fee. So, in the context of the 2017 Account Agreement, SCU did not breach by charging its members an NSF fee every time a merchant presented an item for payment against insufficient available funds. Accordingly, relief is foreclosed and Toth's claim for breach is dismissed with prejudice for NSF breach claims governed by the 2017 and 2019 Account Agreements. The rest of SCU's motion to dismiss related to Toth's breach of contract claim regarding NSF fees governed by the 2013 Account Agreement is **DENIED** and that part of the claim may proceed.

### B. Covenant of Good Faith and Fair Dealing

SCU contends that the Court must dismiss Toth's claim for breach of the implied covenant of good faith and fair dealing because it is not a stand-alone claim under Illinois law. "Under Illinois law the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract." *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 792 (7th Cir. 1995) (citing *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir. 1992)). "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that

could not have been contemplated at the time of drafting, and which therefore was not resolved by the parties." *Id.* (quoting *Kham & Nate's Shoes No. 2 v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir. 1990)). An alleged violation of the covenant does not give rise to an independent source of obligations and, thus, cannot form the basis for an independent tort action. *See Wolf v. Fed. Republic of Germany*, 95 F.3d 536, 543 (7th Cir. 1996) (citations omitted). Simply put, Illinois law does not recognize this cause of action. As a result, relief is foreclosed and Toth's claim for breach of implied covenant of good faith and fair dealing is also dismissed with prejudice.

## II. Quasi-Contract Claims (Counts III and IV)

SCU asserts that the Court must dismiss Toth's equitable claims of unjust enrichment and "money had and received" because the relationship between SCU and Toth was exclusively governed by the terms of the express contracts. "In Illinois recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013); *see People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992) ("Because unjust enrichment is based on an implied contract, where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.") (internal quotation marks omitted). The United States Court of Appeals for the Seventh Circuit does give a very limited exception, however, explaining that a "plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is not an express contract, then the defendant

is liable for unjustly enriching himself at my expense." *Page*, 2020 WL 5076690, at *5 (quoting *Cohen*, 735 F.3d at 615).

Toth's Complaint asserts that she entered into binding contracts with SCU and SCU failed in its performance of those contracts. Toth's claims for unjust enrichment and "money had and received" are not, by function of the way the Complaint is written, alternative theories where no express contract exists. Toth incorporated her breach of contract allegations into these equitable claims. Consequently, Toth's claims for unjust enrichment and "money had and received" are dismissed without prejudice and the Court **GRANTS** Toth leave to replead if she can sufficiently allege that she meets the elements of a properly stated unjust enrichment claim and "money had and received" claim.

### III. EFTA Claim (Count V)

SCU argues that the Court must dismiss Toth's EFTA claim because it is time-barred. The EFTA safeguards consumers by building a "basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1328 (7th Cir. 1997) (quoting 15 U.S.C. § 1693(b)). That framework relates to consumer accounts "established primarily for personal, family, or household purposes." *Whittington v. Mobiloil Fed. Credit Union*, 2017 WL 6988193, at *12 (E.D. Tex. Sept. 14, 2017) (quoting 15 U.S.C. § 1693a(2)) (other citations omitted). EFTA gives the Federal Reserve authority to implement regulations "to assist consumers in understanding how overdraft services provided by their institutions operate and to

ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs." *Id.* (citing *Chambers v. NASA Fed. Credit Union*, No. 15-2013, 222 F.Supp.3d 1, 5 (D.D.C., 2016); 15 U.S.C. § 1693b; 12 C.F.R. § 205). "The implementing regulations, collectively known as Regulation E, require financial institutions to obtain a customer's affirmative consent or opt-in before charging overdraft fees on ATM or one-time debit card transactions." *Id.* (citing 12 C.F.R. § 1005.17(b)).

Toth's EFTA claim is based on SCU's lack of authorization to charge her overdraft fees because she was not provided a valid opt-in form that explained that SCU would use the available balance in the account rather than the ledger balance when assessing overdrafts. Toth alleges that SCU violated the EFTA by failing "to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers in a "clear and readily understandable way" a valid description of the overdraft program . . ." because "SCU assesses overdraft fees when there is enough money in the account to pay for the transaction at issue." (Doc. 1, p. 43).

Civil actions for damages for failure to comply with the EFTA may be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(a). The determination of timeliness, therefore, depends upon when the alleged violation took place. Toth does not allege facts to show when she signed the Opt- In Agreement. She does allege that she was charged overdraft fees in violation of the EFTA on three occasions on December 29, 2015 because the Opt-In Agreement did

not describe SCU's overdraft services. Toth filed her complaint on March 24, 2020, more than four years after she was assessed the December 2015 overdraft fees.

SCU maintains that an EFTA claim becomes actionable and the clock starts when the first overdraft fee is charged after an alleged failure to obtain proper authorization pursuant to Regulation E. Toth counters, stating that each improper overdraft fee is actionable under continuing violation doctrine. While the Seventh Circuit has not considered the issue of continuing violation doctrine specifically in relation to the EFTA statute of limitations, it has found that continuing violation doctrine does not resurrect an otherwise untimely suit where "a single event gives rise to continuing injuries." *Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003). Furthermore, "most district courts that have considered the EFTA statute of limitations have concluded that the limitation period is triggered when a financial institution makes a first unauthorized transfer or charges an overdraft fee, rejecting the application of a "continuing violation" theory." *Domann*, 2018 WL 4374076, at *6 (collecting cases). The first alleged improperly assessed overdraft fee on the record occurred in December 2015 by Toth's admission in her Complaint. Toth was aware– or should have been aware–that she had been misled when the first overdraft charge took place in December 2015. At that time, her EFTA claim based on the alleged Regulation E violation was complete.

What is more, the discovery rule does not save Toth's claims. When the discovery rule applies, the limitations period does not begin to run until the plaintiff discovers (or reasonably should discover) that he has been injured. *United States v.*

*Norwood*, 602 F.3d 830, 837 (7th Cir. 2010) (citations omitted). If Toth had exercised due diligence, she would have discovered her injury either by viewing her online SCU account or her bank statements. *See Domann*, 2018 WL 4374076, at *10 (collecting cases). Therefore, relief is foreclosed and Toth's claim under EFTA is dismissed with prejudice.

**IV. ICFA Claim (Count VI)**

SCU contends that the Court must dismiss Toth's ICFA claim because it is based on the same theories of wrongdoing as her breach of contract claim. ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (citation and internal quotation marks omitted). A plaintiff may allege either deceptive or unfair conduct (or both) under ICFA. *Siegel*, 612 F.3d at 935; *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 575 (7th Cir. 2012). "[U]nfair or deceptive acts or practices under the statute include false promise[s], misrepresentation[s] . . . or omission[s] of any material fact." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (citing 815 ILL. COMP. STAT. 505/2) (internal quotation marks omitted). Deceptive practice claims must be alleged with particularity under Rule of 9(b). *Id.*

While unfair or deceptive conduct in a contractual setting may be actionable under ICFA, unfair or deceptive conduct that is not distinct from the alleged breach of contract allegations is not actionable under ICFA. *Greenberger*, 631 F.3d at 400. All of Toth's ICFA allegations, including SCU's failure to contractually disclose balance

differences in assessing fees, are intermingled with her breach of contract claims, and she fails to allege deceptive business practices under Rule 9(b)'s particularity requirements. Accordingly, relief is foreclosed and Toth's claim under ICFA is dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS in part** and **DENIES in part** SCU's MTD (Doc. 19). Toth's Count I claim for breach of contract on overdraft fees is **dismissed with prejudice**. Toth's Count II claim for breach of contract on NSF fees governed by the 2017 and 2019 Account Agreements is **dismissed with prejudice**. Toth's breach of contract claims related to NSF fees governed by the 2013 Account Agreement may proceed. Additionally, Toth's Count I and II claims for breach of implied covenant of good faith and fair dealing are **dismissed with prejudice**. Toth's Count III and IV claims for unjust enrichment and "money had and received" are **dismissed without prejudice**. Toth's Count V claim under EFTA is **dismissed with prejudice**. Toth's Count VI claim under ICFA is **dismissed with prejudice**. Toth has 14 days to file an amended complaint based on the Court's ruling.

IT IS SO ORDERED.

DATED:    February 12, 2021

>                             s/ *Stephen P. McGlynn*
>                             STEPHEN P. McGLYNN
>                             U.S. District Judge